**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| COUNTRY CLUB FOOD MARKET, )<br>a New Mexico company, )<br>　　　　　　　　　　　　　　　　)<br>　　　　　Plaintiff, )<br>　　　　　　　　　　　　　　　　)<br>vs. 　　　　　　　　　　　　　　)　　No. CIV 07-972 RB/DJS<br>　　　　　　　　　　　　　　　　)<br>UNITED STATES OF AMERICA; )<br>UNITED STATES DEPARTMENT OF )<br>AGRICULTURE, FOOD AND )<br>NUTRITION SERVICES, )<br>　　　　　　　　　　　　　　　　)<br>　　　　　Defendants. )<br>　　　　　　　　　　　　　　　　) |  |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.　　INTRODUCTION**

**THIS MATTER** comes before the Court on Plaintiff Country Club Food Market's request for judicial review of Defendant United States'[1] Final Agency Decision (Admin. R. [Doc. 17] at 86-91), pursuant to 7 U.S.C. § 2023(a)(13) (2008).  (*See* Cmplt. [Doc. 1] at ¶¶ 20-22, 28, 30-31, 35). The Final Agency Decision disqualifies Plaintiff from participation in the Food Stamp Program for a six month period.  The Court has jurisdiction under 28 U.S.C. § 1331 (2008) and 7 U.S.C. § 2023(a)(13).  The parties have apparently agreed to resolve the matter through briefs on the merits. (*See* Stipulated Order [Doc. 16]; Br. Merits Pl. Country Club Food Market [Doc. 21]; United States' Resp. Br. Merits [Doc. 22]).  After reviewing both parties' submissions, as well as the relevant law,

---

[1] "[T]he United States is the only proper defendant in an action for judicial review of a disqualification from the Food Stamp Program."  *Brooks v. United States*, 64 F.3d 251, 253 n.1 (7th Cir. 1995).  *See also* 7 U.S.C. § 2023(a)(13) ("If the store . . . feels aggrieved by such final determination, it may obtain judicial review thereof by filing a complaint against the United States . . . .").  Accordingly, the Court notes that the United States is the only proper defendant in this case.

the Court makes the following Findings of Fact and Conclusions of Law. Fed. R. Civ. P. 52. Specifically, the Court **CONCLUDES** that the United States Department of Agriculture Food and Nutrition Service did not act in an arbitrary and capricious manner in imposing a six month disqualification upon Country Club Food Market.

## II.     FINDINGS OF FACT

1.      Country Club Food Market (CCFM) is a small retail food store located at 1002 Coal Ave. S.W. in Albuquerque, New Mexico. Messrs. Hussein Awad and Ghassan Awad's father owned CCFM prior to selling it to them[2] before or around July 6, 1994.

2.      On or about June 15, 1994, Mr. Ghassan Awad applied, on behalf of CCFM, to participate in the United States' Food Stamp Program (FSP). In the application, Mr. Ghassan Awad certified that he understood the FSP regulations and the penalties for violating the regulations. He also accepted responsibility, on behalf of CCFM, for preventing violations of FSP regulations, including accepting food stamps for ineligible items. Mr. Ghassan Awad also accepted responsibility, on behalf of CCFM, for employee violations of the regulations.

3.      On or about July 7, 1994, CCFM became a participating retail food store in the FSP.

4.      Mr. Hussein Awad applied for CCFM's program reauthorization on July 11, 1996, and thereby certified that he had also read and understood the warnings and certification.

5.      Mr. Ghassan Awad similarly applied for CCFM's reauthorization on April 25, 1999, and he once again certified that he had read the warnings and certification provided to him.

6.      The Government granted CCFM's reauthorization on August 20, 1996 and June 2, 1999, respectively. It is unclear if CCFM was required to, or did, seek reauthorization after June 2, 1999.

---

[2] The Awad spouses also own a share of CCFM.

7.      The Administrative Record indicates that CCFM did not violate the food stamp regulation between July 7, 1994 and October 19, 2005.

8.      On May 16, 2005, the Retailer Investigations Branch (RIB) of the Dallas Area Office of United States Department of Agriculture (USDA) Food and Nutrition Service (FNS) selected CCFM for an investigation.  It is unclear if RIB randomly selected CCFM for investigation or if RIB had some indication that CCFM may have been violating the food stamp regulations.

9.      From October 20, 2005 through November 15, 2005, an undercover RIB investigator visited CCFM on eight occasions.  With one exception, the investigator always visited the store between approximately 3:30 P.M. and 6:00 P.M.

10.     The investigator succeeded in purchasing "common ineligible items" with food stamps during six of the eight visits.  The "common ineligible items" consisted of steel wool soap pads, dryer sheets, a scrub sponge, dishwashing liquid, scouring cleanser, napkins, air freshener, paper bowls, sandwich bags, five-dollar phone cards, and laundry detergent.

11.     "Common ineligible items" accounted for thirty percent or more of the purchase on four occasions: October 26, 2005, October 27, 2005, November 1, 2005, and another unspecified date. The FNS' own documentation reflects this fact.

12.     CCFM has only one check-out counter.  One clerk, Ms. Theresa Aguilar, was responsible for all of the ineligible sales.

13.     Ms. Aguilar also took part in the final sale to the investigator on November 15, 2005, which did not result in the sale of any ineligible products even though the investigator attempted to purchase a carton of cigarettes.  When the investigator asked Ms. Aguilar if s/he could purchase the cigarettes on the card, Ms. Aguilar stated, "I'll ask my boss.  I think he will."  Her boss, however, did not allow her to sell the cigarettes to the investigator.

14.     Another unidentified clerk refused to sell the investigator ineligible items on November 15, 2005. This visit took place at 12:10 P.M. and was the single instance where the investigator visited CCFM outside of the 3:30 P.M. - 6:00 P.M. window.

15.     The FNS Dallas Field Office received the RIB investigation report on March 27, 2006. On April 7, 2006, nearly five months after the conclusion of the investigation, FNS sent a charge letter to CCFM. The letter alleged that CCFM had violated 7 C.F.R. § 278.2 (2005). The letter also indicated that the United States was considering disqualification or a civil money penalty in lieu of disqualification as possible sanctions. The letter also encouraged CCFM to respond to the charge letter within ten days of receipt, but did not advise CCFM that it could retain an attorney.

16.     On April 13, 2006, Mr. Hussein Awad responded to the charge letter on behalf of CCFM. He apologized for any wrongdoing and explained that one clerk was responsible for all of the ineligible sales. Mr. Hussein Awad also explained that the clerk acted contrary to her training and without the knowledge of management. He attributed the ineligible sales to the clerk's ignorance or laziness, but explained that the clerk did not intentionally violate the food stamp regulations. Nevertheless, CCFM accepted responsibility for the clerk's acts and explained that the firm had implemented a more aggressive training program. Finally, the response letter indicated that CCFM serves one of the poorest neighborhoods in Albuquerque, New Mexico, that the Government had never before cited the CCFM for violations, and that CCFM was fully committed to complying with the food stamp regulations.

17.     On April 20, 2006, the FNS Dallas Field Office issued its determination. The FNS considered Mr. Hussein Awad's response, but nevertheless determined that six violations had indeed occurred and that the appropriate sanction was a six month disqualification. Recognizing that the response letter potentially raised the issue of hardship on food stamp recipients in the area, FNS

examined whether CCFM was a candidate for a civil money penalty in lieu of the six month disqualification. FNS found that CCFM did not qualify for a civil money penalty, however, because there was an authorized, comparable firm within walking distance from CCFM. The determination letter also explained how CCFM could appeal FNS' decision.

18.     On April 28, 2006, CCFM, with the assistance of an attorney, appealed the Dallas Field Office determination to the FNS Administrative Review Branch (ARB) in Alexandria, Virginia. The appeal letter repeated many of the arguments Mr. Hussein Awad presented in his April 13, 2006 response. CCFM expressed regret over the violations, explained that it had reeducated its current employees, instituted aggressive training for new employees, and pointed out that Ms. Aguilar was responsible for all of the ineligible sales. CCFM also reminded FNS that it had never before been cited for food stamp violations. The appeal letter also specifically requested a civil money penalty in lieu of the disqualification because Arrow Supermarket is approximately one mile from CCFM and is therefore inaccessible to recipients who lack transportation, according to CCFM.

19.     On or about June 1, 2006, the ARB stayed imposition of the disqualification.

20.     More than a year later, on or about August 28, 2007, the ARB issued its Final Agency Determination (FAD). The ARB determined that there was sufficient evidence to sustain the determination of the Dallas Field Office. Specifically, the ARB examined whether the determination of the field office was consistent with 7 C.F.R. § 278.6(e)(5) (2005). The FAD indicated that 32.7 percent of all of the items sold during all of the transactions were "common nonfood items" and, therefore, ineligible. The FAD also recognized that one clerk was responsible for all of the ineligible sales.

21.     The ARB utilizes a "clear preponderance of the evidence" standard, meaning that "an appellant has the burden of providing relevant evidence which a reasonable mind, considering the

record as a whole, might accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true." (Admin. R. at 88). The FAD references the controlling statute and regulations, but also mentions that "FNS policy memoranda and clarification letters . . . further explain the condition necessary in order to disqualify retail food stores." *Id.*

22.     The ARB considered all of CCFM's arguments. In response to CCFM's argument that only one clerk carelessly committed the violations without the owners' knowledge, the FAD stated that this contention was not a valid basis for dismissal of charges or mitigation of the sanction. The FAD reiterated that store owners are ultimately liable for all violations because to hold otherwise would render the enforcement provisions of the Food Stamp Act (FSA) meaningless. With regards to CCFM's argument that it had already reeducated its current employees and implemented aggressive training for future employees, the FAD stated that no rule or guideline permitted waiver or reduction of a sanction on that ground. Finally, the FAD stated that CCFM's previously clean record did not provide a valid basis for dismissal of charges or mitigation of the sanction.

23.     The FAD also addressed CCFM's recipient hardship argument, but nevertheless found that CCFM did not qualify for a civil money penalty because two other stores, Arrow Supermarket and Lowes, were located 0.8 miles from CCFM and carried "as large a variety of staple food items at comparable prices." (Admin. R. at 90). The FAD did recognize, however, that any disqualification poses "some degree of inconvenience" to recipients. (*Id.*).

24.     Lowes and Arrow Supermarket are less than one mile from CCFM.

25.     On September 6, 2007, the Dallas Field Office notified CCFM that the disqualification period would begin on September 28, 2007.

26.     On September 26, 2007, CCFM filed its Complaint, as well as a Motion to Stay Federal Administrative Action [Doc. 2]. On October 18, 2007, this Court issued a Stipulated Order [Doc. 16] recognizing the parties' agreement to stay imposition of the disqualification.

27.     Pursuant to a motion by CCFM, this Court ordered the United States to supplement the administrative record on March 19, 2008. As part of the response, the United States stated that the Civil Monetary Penalties section of the FNS Compendium was the only guideline that the FNS considered, in any manner, in CCFM's case.

### III.    CONCLUSIONS OF LAW

#### A.    Purpose and Authority

28.     Congress implemented the Food Stamp Act (FSA) of 1964, 7 U.S.C. §§ 2011-2036 (2008), to establish a Food Stamp Program (FSP) that would "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." *Id.* at § 2011.

29.     Congress delegated power to the Secretary of Agriculture to administer the FSP. *Joudeh v. United States*, 783 F.2d 176, 178 (10th Cir. 1986). The Secretary, in turn, administers the program through the USDA FNS. *Id.*

30.     The FSA permits retail food stores to accept food stamps, but provides for disqualification if a store violates the FSA or its implementing regulations. *Id.* The FSA also allows a store facing sanction to appeal the disqualification, first to the ARB, and then to a federal district court. *See id.*

#### B.    Standard

31.     Courts conduct de novo review of a decision to disqualify a retail food store from participation in the FSP. *See* 7 U.S.C. § 2023(a)(13) & (15); *Joudeh*, 783 F.2d at 178; 7 C.F.R. § 279.7(a) & (c) (2008). Courts interpret this standard as requiring de novo review of violation findings, yet requiring only an arbitrary and capricious review of the discretionary selection of a

sanction. *See Kulkin v. Bergland*, 626 F.2d 181, 184 (1st Cir. 1980); *Bruno's, Inc. v. United States*, 624 F.2d 592, 594 (5th Cir. 1980).

32. "Arbitrary and capricious" means "unwarranted in law or without justification in fact."[3] *Kulkin*, 626 F.2d at 184. In other words, a court must determine "whether the agency properly applied its regulations," *Broad St. Food Mkt., Inc. v. United States*, 720 F.2d 217, 220 (1st Cir. 1983), and there must be "a rational connection between the facts found and the choice made," *Latino Mart & Discount Corp. v. United States*, No. 07-22690, 2008 WL 616109, at *2 (S.D. Fla. Mar. 13, 2008).

33. Excessive variance in the application of a sanction, not merely uneven application, is arbitrary and capricious. *Cross v. United States*, 512 F.2d 1212, 1218 n.8 (4th Cir. 1975). Nevertheless, "significant departures from [agency] guidelines m[ay] indicate arbitrary or capricious action." *Sims v. U.S. Dep't of Agric. Food & Nutrition Serv.*, 860 F.2d 858, 861 (8th Cir. 1988).

34. Arbitrary and capricious review is narrow, and courts may not substitute their own judgment for that of the agency. *Latino Mart*, 2008 WL 616109 at *2. A court may not find a sanction arbitrary and capricious if the agency has "follow[ed] its own regulations and guidelines in imposing [the] sanction." *E & L Food, Inc. v. United States*, No. 98-4339, 1999 WL 167719, at *3 (E.D.N.Y

---

[3] Though both parties reference the traditional substantial evidence standard in their briefs, it is unclear if that standard applies to the arbitrary and capricious review in food stamp disqualification cases. The Court was unable to locate any United States Court of Appeal decision that utilized the substantial evidence standard in a disqualification such as the one now before the Court. *See Ibrahim v. United States*, 834 F.2d 52, 53-54 (2nd Cir. 1987) ("The Food Stamp Act's de novo review provision embodies a different and broader scope of review than that available under the APA. This review requires a reexamination of the entire matter rather than a mere determination of whether the administrative findings are supported by substantial evidence. As a result, the district court must reach its own factual and legal conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings.") (internal quotations and citations omitted). *But see United States v. Hardage*, 663 F. Supp. 1280, 1287-88 (W.D. Okla. 1987) (holding that the APA did not apply to a Superfund case and stating that "comparisons to the scope of review for sanctions involving violations of the Food Stamp Act . . . fail to persuade the [c]ourt.").

Jan. 19, 1999). Only if a court finds a sanction arbitrary and capricious may it prescribe an alternative sanction. *See Cross*, 512 F.2d at 1218.

### C. De Novo Review of Findings

35. An authorized retail food store may accept food stamps only for eligible food. 7 C.F.R. § 278.2(a). Eligible food includes "[a]ny food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods . . . prepared for immediate consumption . . . ." *Id.* at § 271.2; *Brooks v. United States*, 64 F.3d 251, 253 n.3 (7th Cir. 1995).

36. While the Court recognizes that agency guidelines, such as the FNS Compendium, do not have the force of law, they are nevertheless instructive. *Varnadore v. United States*, 785 F. Supp. 550, 555 (D.S.C. 1991).

37. The FNS Compendium divides ineligible items into three categories: marginal, common, and major. FNS Compendium, Final Determinations, Disqualifications & Fines (FDDF) § 1021(A)(2)(a). Marginal ineligible items are goods that can easily be mistaken as eligible, such as hot food or medicine. *Id.* at § 1021(A)(2)(a)(1). Common ineligible items cannot easily be mistaken as eligible items and generally include low cost cleaning products, paper products, and common household goods. *Id.* at § 1021(A)(2)(a)(2). The FNS considers a carton of cigarettes a major ineligible item. *Id.* at § 1021(A)(2)(a)(3)(b)(1).

38. The FNS Compendium also defines a violation of the food stamp regulations as "clearly violative" only when the ineligible items comprise thirty percent or more of the total purchase in a single transaction. *Id.* at § 1021(A)(2)(b). The FNS distinguishes "clearly violative" transactions from instances where "ineligible items could easily have been sold without being noticed by the clerk." *Id.*

39.     CCFM does not deny that violations occurred in its store, and the FAD indicates that CCFM sold ineligible items during six transactions and that the ineligible items accounted for 32.7 percent of all of the transactions combined.

40.     FNS' own guidelines, however, indicate that the calculations must be made on a per transaction basis. Because the number of "clearly violative" transactions is directly relevant to the appropriate sanction choice, the Court hereby concludes that CCFM committed four "clearly violative" transactions because the ineligible items Ms. Aguilar sold to the investigator comprised thirty percent or more of the purchase on only four occasions. *See Sims*, 860 F.2d at 862; *E & L Food*, 1999 WL 167719 at *4 ("[T]he Handbook states that only 'clearly violative transactions' are used in the calculation of the penalty.").[4] As noted above, the Government's own administrative record supports this conclusion. (*See* Admin. R. at 64) ("Transactions meeting 30% rule: 4.").

### D.     Arbitrary and Capricious Review of Sanction

41.     "The FNS will not authorize a store's . . . participation in the FSP until the store owners certify that they have read and are familiar with the governing statutes and regulations."[5] *Phany Poeng v. United States*, 167 F. Supp. 2d 1136, 1139 (S.D. Cal. 2001).

42.     If an authorized retail food store violates the FSA or its implementing regulations, the FNS may disqualify that store from the FSP for a specified period of time. 7 U.S.C. § 2021(a) (2008); *Joudeh*, 783 F.2d at 179. A food stamp regulation requires FNS to disqualify a store for six months

---

[4] Although the Court does not explicitly find that the FNS Compendium instructs FNS staff to count only "clearly violative" transactions for purposes of calculating the correct penalty, in this case the Court will count only the "clearly violative" transactions to determine whether FNS acted in an arbitrary and capricious manner because, by FNS' own terms, "ineligible items could easily have been sold without being noticed by the clerk" in "non-clearly violative" transactions. FNS Compendium, FDDF at § 1021(A)(2)(b).

[5] The authorization and reauthorization of retail food store's participation in the FSP is governed by 7 U.S.C. § 2018 (2008) and 7 C.F.R. § 278.1 (2008). It is unclear how frequently the FNS must reauthorize a store's participation.

if the disqualification is the store's first sanction, "and the evidence shows that personnel of the [store] have committed violations such as . . . the sale of common nonfood items due to carelessness or poor supervision by the [store]'s ownership or management." 7 C.F.R. § 278.6(e)(5). *See also Sims*, 860 F.2d at 860.

43.     "An improper sale by a c[lerk] is sufficient to establish a violation" because, "[i]n accepting . . . food stamp[s] . . ., the c[lerk] intend[s] to benefit the store." *Wolf v. United States*, 662 F.2d 676, 678 (10th Cir. 1981).

44.     If the store's "violations are too limited to warrant . . . disqualification," however, FNS must instead issue the store a warning letter. 7 C.F.R. at § 278.6(e)(7). *See also Dale & Selby Superette & Deli v. U.S. Dep't of Agric.*, 836 F. Supp. 669, 671 (D. Minn. 1993). The FNS Compendium, in turn, calls for a warning letter if the store has made "only . . . one or two sales of common ineligible items." FNS Compendium, FDDF at § 1022(H)(1).

45.     In making the disqualification determination, the FNS must "consider: (1) the nature and scope of the violations committed by personnel of the firm, (2) any prior action taken by FNS to warn the firm about the possibility that violations are occurring, and (3) any other evidence that shows the firm's intent to violate the regulations." 7 C.F.R. § 278.6(d).

46.     The FNS Compendium expands upon the two-prong analysis in the first factor. *See* FNS Compendium, FDDF at § 1021(A)(1)-(2). Section 1021(A)(2) addresses the nature of the violation by defining the types of ineligible items: marginal, common, and major. *Id.* at § 1021(A)(2). Section 1021(A)(1) defines the scope of the violation by creating four categories that describe the violations: inadvertent, careless, usual, and serious. *Id.* at § 1021(A)(1).

47.     The FNS Compendium defines "careless" as "[t]he sale of a total of three inexpensive nonfood items over one, two, or three transactions,[6] meaning that the owner or management was not thorough in supervising personnel of the firm." *Id.* at § 1021(A)(1)(b). *See also Latino Mart*, 2008 WL 616109 at *5. "Usual" is "four or more sales of at least three inexpensive nonfood items each, without a substantial attempt to comply, indicating that selling such items for food stamp benefits is the firm's usual practice." FNS Compendium, FDDF at § 1021(A)(1)(c).

48.     Although the second and third factors mention warnings and intent, respectively, numerous courts have judged that 7 C.F.R. § 278.6(d) does not actually require either in the case of a six month disqualification.[7] *See, e.g.*, *Sims*, 860 F.2d at 861 ("[T]he regulations do not require the FNS to explicitly find that the [store] intended to violate the law.") (internal quotations omitted); *E & L Food*, 1999 WL 167719 at *4-5 (concluding "that the USDA is not required to warn [stores] before imposing a six month disqualification or a monetary penalty [in lieu thereof] . . . ."). *But see Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 565 (9th Cir. 1986) ("The FNS review officer did not consider plaintiff's intent as required by 7 C.F.R. § 278.6(d).").

---

[6] It is unclear if the FNS would find a store to be careless if it sold one inexpensive food item on each of three separate transactions or if the guidelines require the sale of three inexpensive food items during each sale. This is especially so because, as noted above, at least one court reads the FNS Compendium as requiring that the FNS count only "clearly violative" sales for the purposes of calculating the appropriate penalty. *E & L Food*, 1999 WL 167719 at *4. As the Court has already indicated, however, the Court will only count "clearly violative" transactions in measuring the appropriateness of the sanction.

[7] The food stamp regulations require warnings for three and five year disqualifications, 7 C.F.R. § 278.6(e)(2) & (3)(i), and the regulations specifically do not require a warning for a one year disqualification, *id.* at § 278.6(e)(4). The regulations do not specifically address whether a warning is required for a six month disqualification, but by inference, the regulations do not require a warning for a six month disqualification. *E & L Food*, 1999 WL 167719 at *4-5.

49.	Rather, the regulation merely requires FNS to consider any previous actions taken by FNS with regard to the store[8] and any evidence tending to show the store intended to violate the FSP regulations.  *See Latino Mart*, 2008 WL 616109 at *5; *E & L Food*, 1999 WL 167719 at *4.

50.	Finally, the FNS must consider any refusals to complete an ineligible sale "to determine whether reported violations were possibly a result of error or misunderstanding."  FNS Compendium, FDDF at § 1021(C).  The FNS decision maker must pay special attention to who is making the refusal, the type of ineligible item that was refused, "and the extent and pattern of the refusals."  *Id.*  "For example, refusals to sell major ineligible items . . . would diminish the seriousness of a transaction in which one or two . . . common ineligible items were sold without refusal."  *Id.*  According to the FNS Compendium, remarks made by clerks during a refusal may be significant.  *Id.*

51.	If the store's disqualification poses a hardship to recipients, the FNS may impose a civil money penalty in lieu of the disqualification.  7 U.S.C. § 2021(a); *Joudeh*, 783 F.2d at 179; 7 C.F.R. § 278.6(a).  The disqualification of a store poses a hardship to recipients in the surrounding community if there is no "other authorized retail food store in the area selling, at comparable prices, as large a variety of staple food items . . . ."  FNS Compendium, Civil Money Penalties (CMP) § 1020(C).  In an urban environment, the FNS Compendium defines "in the area" as "within a one-

---

[8] It does not appear that a lack of prior action against a store facing sanction weighs in favor of the store. *Cf. Latino Mart*, 2008 WL 616109 at *5 ("FNS did not consider any prior action by FNS to warn [the store], as FNS has not taken any such action in this case."); *Kim v. United States*, 903 F. Supp. 118, 119 (D.D.C. 1995) ("No prior warnings were given, so obviously there was no consideration given to any such warnings."). *But see Phany Poeng*, 167 F. Supp. 2d at 1140 ("While these regulations require FNS consideration of whether a prior warning was issued . . . ."). Moreover, neither the FNS Compendium nor the regulations seem to permit mitigation of a sanction based on increased training implemented after the violations have occurred. *Cf. Kim v. United States*, 822 F. Supp. 107, 112 (E.D.N.Y. 1993) ("[P]laintiff has not pointed out . . . any regulation which requires the FNS to consider 'mitigating circumstances' . . . ."). Lastly, the Government may not prove a store owner's negligence via the implementation of training subsequent to a violation.  Fed. R. Evid. 407.

mile radius of the [store facing disqualification]." *Id.* at § 1020(E). *See also Latino Mart*, 2008 WL 616109 at *4.

52.  Whether the circumstances call for a civil money penalty "is peculiarly a matter of administrative competence," *Broad St. Food Mkt.*, 720 F.2d at 221 (internal quotation and citation omitted), and courts measure the agency choice between disqualification and a money penalty by the arbitrary and capricious standard, *cf. Kulkin*, 626 F.2d at 184; *Bruno's*, 624 F.2d at 594.

53.  FNS' decision to disqualify CCFM for a period of six months was not arbitrary or capricious.

54.  Via Ms. Aguilar's sales, CCFM admittedly committed four "clearly violative" violations of the FSA and food stamp regulations. *See* FNS Compendium, FDDF at § 1021(A)(2)(b). Four "clearly violative" transactions actually puts CCFM beyond the FNS Compendium definition of "careless" and within the range of "usual." *See* FNS Compendium, FDDF at § 1021(A)(1)(b)-(c).

55.  After discounting the scope of the violations because of CCFM's two refusals to sell ineligible items, FNS Compendium, FDDF at § 1021(C), however, CCFM's violations are most appropriately characterized as "the sale of common nonfood items due to carelessness or poor supervision by the [store]'s ownership or management," 7 C.F.R. § 278.6(e)(5), because this is CCFM's first sanction and CCFM is ultimately responsible for Ms. Aguilar's sales. *See Wolf*, 662 F.2d at 678; 7 C.F.R. § 278.6(e)(5).

56.  Moreover, both Messrs. Hussein Awad and Ghassan Awad certified that they read the food stamp regulations and understood their ramifications.

57.  Most important, however, is the fact that the six month disqualification is mandatory under these circumstances.

58.  FNS' decision to deny CCFM's request for a civil money penalty was also not arbitrary or capricious.

59.     Although the FNS may impose a civil money penalty in lieu of disqualification if the disqualification will pose a hardship to food stamp recipients, 7 U.S.C. § 2021(a); *Joudeh*, 783 F.2d at 179; 7 C.F.R. § 278.6(a), the FNS Compendium clarifies that a hardship occurs in an urban area, like the one at issue here, only when there is not another authorized store within a one-mile radius selling as wide a variety of goods at competitive prices, FNS Compendium, CMP at § 1020(C). Here, CCFM does not dispute that both Lowes and Arrow Supermarket are within a one-mile radius of CCFM.

60.     CCFM also does not challenge FNS' conclusion that those stores sell a variety of items at competitive prices.  Accordingly, CCFM is not eligible for a civil money penalty in lieu of disqualification.

61.     The law requires this Court to conduct a narrow arbitrary and capricious review and prevents the Court from substituting its own judgment for that of the FNS.  *Latino Mart*, 2008 WL 616109 at *2.  Accordingly, although the Court might otherwise be persuaded by CCFM's argument that the sanction should be mitigated because only one clerk violated the regulations and CCFM has since implemented aggressive training, the law prevents the Court from doing so.[9]  *Cf. Kim*, 822 F. Supp. at 112.

62.     Moreover, though CCFM argues that FNS acted in an arbitrary and capricious manner by not issuing CCFM a warning letter, the regulations do not require FNS to issue a warning letter in a case such as this.  The regulations require a warning letter only for three and five year disqualifications, 7 C.F.R. § 278.6(e)(2) & (3)(i), and the FNS only disqualified CCFM for six months.

---

[9] The Court does take this opportunity to point out, however, that the Government may not use CCFM's subsequent implementation of training against CCFM.  Fed. R. Evid. 407.

63.     Additionally, the FNS Compendium states that warning letters are only appropriate if a store has committed one or two violations.  FNS Compendium, FDDF at § 1022(H)(1).  CCFM allowed four "clearly violative" transactions to occur, so under the FNS Compendium, CCFM was not eligible for a warning letter.

64.     Furthermore, the absence of a prior warning, i.e., a clear record, does not weigh in favor of CCFM.  *Cf. Latino Mart*, 2008 WL 616109 at *5; *Kim*, 903 F. Supp. at 119.

65.     Lastly, CCFM did not raise the issue of how FNS decides to proceed with an investigation after one or two violations, rather than issue a warning letter at that stage, and CCFM did not allege that FNS applied the regulations and guidelines differently to other stores.

66.     In addition, the regulations do not require that the FNS establish that CCFM intended to violate the food stamp regulations.  *E.g.*, *Sims*, 860 F.2d at 861.  The regulations only require FNS to consider evidence of intent, not to establish intent.  *See Latino Mart*, 2008 WL 616109 at *5; *E & L Food*, 1999 WL 167719 at *4.

67.     Just as the Court cannot weigh CCFM's clear record or lack of intent in CCFM's favor, the Court also cannot take it upon itself to define "in the area" for the purposes of a civil money penalty while conducting an arbitrary and capricious review.  *See Latino Mart*, 2008 WL 616109 at *2.  The FNS Compendium indicates that a disqualification poses a hardship to food stamp recipients only if there are no other stores within a one-mile radius of the store, not within a one-mile radius of the store's customers – as CCFM would have the Court find.  FNS Compendium, CMP at § 1020(E).

68.     The one-mile radius definition is not unreasonable, even considering recipients' potential lack of transportation.  Accordingly, FNS' application of that guideline is not arbitrary and capricious.

69.     FNS followed the food stamp regulations and its own guidelines, *see E & L Food*, 1999 WL 167719 at *3, and properly applied the regulations, *see Broad St. Food Mkt.*, 720 F.2d at 220.

70.     There is unquestionably a rational connection between the facts of the case and the FNS decision to impose a six month disqualification because the food stamp regulations and FNS Compendium require a six month disqualification in cases with facts like those in this case. *See Latino Mart*, 2008 WL 616109 at *2.

71.     In short, CCFM has not shown that the disqualification is unwarranted in law or without justification in fact. *See Kulkin*, 626 F.2d at 184.

72.     Because FNS did not act in an arbitrary and capricious manner, the Court must defer to the USDA and may not order an alternative sanction. *See Cross*, 512 F.2d at 1218.

**IV.     CONCLUSION**

73.     Neither FNS' decision to disqualify CCFM for a period of six months nor FNS' decision to deny CCFM's request for a civil money penalty in lieu of disqualification was arbitrary or capricious because the six month disqualification is called for under both the food stamp regulations and the FNS Compendium.

**IT IS SO ORDERED.**

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**